Robert Wisniewski, Esq.
ROBERT WISNIEWSKI P.C.
17 State Street, Suite 820
New York, NY 10004
Tel. (212) 267-2101
E-mail: rw@rwapc.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
CHRISTIAN LEITCH, JERRELL SAMUELS, ABRIL
VITTE-RUIZ, on behalf of themselves and on behalf of
others similarly situated,

**Docket No.: 22-cv-6121**

Plaintiffs,

- against -

AMAZON SERVICES COM LLC f/k/a
AMAZON SERVICES COM INC.

Defendant
-----------------------------------------------------------------X

**CLASS ACTION COMPLAINT**

1.  Plaintiffs Christian Leitch ("Leitch"), Jerrell Samuels ("Samuels") and Abril Vitte-Ruiz ("Ruiz")(collectively, Leitch, Samuels and Ruiz are "Plaintiffs") by and through his attorneys, Robert Wisniewski P.C., as and for their Complaint against Amazon Services Com LLC f/k/a Amazon Services Com Inc. ("Defendant"), state as follows:

2.  Plaintiffs, former employees of Defendant at its DNJ-3 Delivery Station in the Bronx, bring this collective action on behalf of themselves and on behalf of all workers who have worked at Delivery Station DNJ-3 ("Delivery Station DNJ-3" or the "Warehouse") under the Fair Labor Standards Act of 1938, as amended (29 U.S.C. § 201, et seq.) ("FLSA") and the various wage orders promulgated by the U.S. Department of Labor and codified

in 29 C.F.R. § 552 et. seq., (**Exhibit 1**). Plaintiffs also bring a Rule 23 class action under the New York Labor Law Articles 6 and 19, ("NYLL") and various wage orders promulgated by the New York State Department of Labor and codified in 12 N.Y.C.R.R. §§ 137-143. Plaintiffs' collective and class action claims are to recover unpaid minimum wages, unpaid overtime wages, unpaid promised wages and liquidated damages related Defendant's failure to pay Plaintiffs and others similarly situated for the daily 30 minute meal breaks which, owing to Defendant's strict rules as to the manner, place and time as to how the breaks were to be taken, were whittled down to five to ten minute "rest breaks", making the entire 30 minute break period compensable under both the FLSA and NYLL. Because Defendant paid its workers a little above the minimum wage, the unpaid compensable breaks caused the wages of Plaintiffs and of all workers working three shifts at the Warehouse who others similarly situated to fall below the minimum wage.

3.      While Plaintiffs do not have a private right of action, Plaintiffs note Defendant's massive violations of NYLL Section 162, which mandates a 45-minute lunch for non-factory workers whose shifts start between 1:00PM and 6:00AM, as Plaintiffs and all other workers at the Warehouse received only 30-minute meal breaks.

4.      Plaintiffs bring this action against Defendant on their own behalf and on behalf of all other night shift employees at the Warehouse who are similarly situated under 42 U.S.C. §2000e-2(a)(1) and (2) and §2000e-3(a) ("Title VII") and 42 U.S.C. §1981 (the Civil Rights Act of 1866)("Section 1981"), as amended, for maintaining a continuous pattern of discrimination and hostile work environment based on  race, color, sex, or national origin, and disability, as well as retaliation that they and other night shift employees

similarly situated experienced at the hands of Defendant's night shift manager, Walkis

Mancebo and his deputies, at the Warehouse where they worked.

5.    Plaintiffs Ruiz brings this action against Defendant on behalf of herself and on behalf of

others similarly situated under the Americans with Disabilities Act of 1990, 42 U.S.C.S.

§§ 12101 *et seq*., for maintaining a continuous pattern of discrimination, hostile work

environment and failure to accommodate based on disability or perceived disability.

6.    Plaintiffs also bring this action against Defendant on behalf of themselves and on behalf

of all other night shift employees at the Warehouse who are similarly situated under the

New York Executive Law §296 ("NYHRL") and under the New York City Charter and

Code §8-207 ("NYCHRL") for maintaining a continuous pattern of discrimination,

hostile work environment, failure to accommodate and for retaliation based on race,

national origin, skin color, sex, sexual orientation, disability as well as for retaliation in

connection with the torment that Plaintiffs and others similarly situated suffered at the

hands of Defendant's night-shift manager, Walkis Mancebo and his deputies.

7.    Plaintiffs were employed by Defendants at the Warehouse located in the Bronx at 1300

Viele Ave., as Associates on the night-shift.

8.    Each Plaintiff was qualified to perform the work of an Associate that Defendant required.

### THE PARTIES

9.    Plaintiff Leitch is a gay African-American male. He resides in New York County. He

worked for Defendant as an Associate (laborer) from October 19, 2019 to June 14, 2020.

10.    Plaintiff Samuels is an African-American male. He resides in Essex County, New Jersey.

He worked for Defendant as an Associate (laborer) from October 19, 2019 to June 16,

2020.

11.    Plaintiff Ruiz is a female suffering from diabetes and high blood pressure. She resides in

the Bronx County. She worked for Defendant as an Associate (laborer) from October 2,

2019 to September 9, 2020.

12.    Defendant Amazon Services Com. LLC is, upon information and belief, a successor in

interest to Amazon Services Com Inc., and is a wholly-owned subsidiary of Amazon.com,

Inc. ("Amazon")

13.     Upon information and belief, at all relevant times herein, Defendant was and is a foreign

business corporation duly organized under, and existing by virtue of, the laws of

Delaware, and having its principal place of business in Seattle, Washington State.

14.    At all relevant times, Defendant was Plaintiffs' employer within the meaning of that term

as found in the FLSA and NYLL and the wage orders promulgated thereunder.

15.    At all relevant times, Defendant had fifteen (15) or more employees and was Plaintiffs'

employer within the meaning of that term as found in the  Title VII and the NYSHRL.

16.    It is beyond cavil that Defendant engages in an enterprise whose annual volume of sales

made or business done is not less than $500,000, the activities of which affect interstate

commerce in that the employees of said Defendant produce, sell or otherwise work on

goods that have been moved in, or produced for, interstate commerce, and Defendant is

thus an employer subject to the jurisdiction of the FLSA.

17.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, in

that this action arises, among others, under 29 U.S.C. § 217 (FLSA); 28 U.S.C. §1337

(Regulation of Commerce); and 42 U.S.C. §2000e-(3)a (Title VII) and 42 U.S.C. §1981

(Section 1981). This Court has jurisdiction over Plaintiffs' state law claims pursuant to 28

U.S.C. §1367, because those claims are related to Plaintiffs' federal claims and form part

of the same case or controversy.

18.    This Court is a proper venue for this action, pursuant to, among other grounds, 28 U.S.C.

§1391(b)(2) because events giving rise to Plaintiffs' claims occurred in this district.

## PREREQUISITES

19.    Plaintiffs timely filed a Charge of Discrimination with the United States Equal

Employment Opportunity Commission ("EEOC") and each of them applied for and was

issued the Notice of Right to Sue ("Right-to-sue Letter").

## JURY TRIAL

20.    Plaintiffs demand a trial by jury on all issues so triable in this action.

## FACTUAL AVERMENTS

### FACTS RELATING TO WAGE VIOLATIONS

*Lightning Speed in Logistics to Create "Customer Extasy"*

21.    Amazon is a conglomerate that famously grew out of its founder, Jeff Bezos' garage.

Over the years through relentless pursuit of increas in sales of merchandise on the

internet, Amazon grew to be a behemoth which now has tentacles in all manner of

businesses, including, *inter alia*, its original business of offering for sale of products

through its website store that include merchandise it has manufactured itself, purchased

for resale and products offered by third-party sellers.

22.    According to its 2021 annual report, Amazon's "financial focus is on long-term,

sustainable growth in free cash flows." According to this annual report, "[f]ree cash flows

are driven primarily by, among others, efficiently managing accounts receivable, inventory, accounts payable, cash capital expenditures." To increase sales of products and services, Amazon focuses on "improving all aspects of the customer experience, including lowering prices, improving availability, **offering faster delivery and performance times**....., improving reliability, and earning customer trust." (emphasis supplied). *See*, generally, Amazon's 2021 10-K report filed with the Securities and Exchange Commission.

23.    To translate this Orwellian corporate-speak: Amazon through its collection of data about its customers and consumers at large is all about squeezing every dollar from the consumer who purchases products on the internet. To invoke Jeff Bezos' famous *bon mots* – Amazon is like a "*cheetah pursuing a wounded gazelle*" – the "gazelle" being the unsuspecting consumer who is so hooked on ordering all manner of things from Amazon and who is supposed to experience "*extasy*" at the practically instantaneous, as if by magic, delivery of whatever product or gadget the consumer ordered.

24.    To achieve "consumer extasy," Amazon realized that speed is supreme and became the industry leader in the delivery of products ordered on its website to customers as fast as possible.

25.    To that end, Amazon has created a network of fulfillment centers, sortation centers and delivery stations. Generally, workers at fulfillment centers fulfill customers' orders, package them into boxes and sort them for delivery in particular locations. Amazon then sends these packages to sortation centers where workers sort packages to send them to the delivery stations (the so-called "last mile" stations) located closre to the consumer, where

packages are further sorted for local delivery by drivers employed by Amazon's delivery service partners.

26.    Amazon built a vast majority of its centers and warehouses in economically hard-hit, remote areas so that, among others, Defendant can pay its employees as little as possible.

27.    These centers and delivery stations are incredibly large operations – most of them city-block size, full of conveyor belts and, where possible, automated and computerized.

28.    Yet the delivery operations cannot be completely automated and computerized. So, Amazon needs a workforce to do all that the machines and computers cannot do. To this end, Amazon, through Defendant and other subsidiaries employs more than one million workers.

25.    Upon information and belief, Defendant operates Amazon's fulfillment centers, sortation centers and delivery stations nationallly, and employs approximately 600,000 workers.

*Delivery Station DNJ-3*

29.    One of such huge operations is Defendant's "last mile" Delivery Station DNJ-3, a huge, football-field long warehouse located at 1300 Viele Ave., Bronx, NY 10474. It occupies an entire city block between Viele Ave. and Ryawa Ave.

30.    There is a loading dock on one side and the entrance for "last mile" delivery vehicles on the other side of the warehouse. The gates for "last mile" delivery vehicles are open at all times. The HVAC is operational only on the loading dock of the warehouse and there is no heat in winter time or cold air in summer time on the side of the warehouse where delivery vehicles enter to pick up packages and boxes ready for the final delivery.

31.    Inside the warehouse, there is an array of conveyor belts and eight sections, labeled A, B,

C, D, E, G, H, and J, with aisles and racks. Amazon's packages and boxes, packed on huge pallets approximately 6 to 8 feet high and wrapped in cellophane are delivered to the loading dock of the warehouse by trailers. They are then removed by loaders who use mechanized carts. The cellophane-wrapped packages are then unpacked from pallets by loaders who cut the cellophane, take out individual packages from the pallets.

32.    The individual packages come in all manner of sizes and shapes: boxes, packets, envelopes – all of various sizes and weights. After taking the individual packages out of the pallet, unloaders put them on the moving conveyor belt. Then approximately twelve employees scan the individual packages and attach a label with the letter A, B, C, D, E, G, H or J of the section where the package is ultimately to go to. Those who scan packages and attach labels with the letters are called Averies (after the most common manufacturer of labels.) Then the individual packages move on the conveyor belt to a point where it splits into three conveyor belts. At that juncture, employees called diverters push the individual packages from the main conveyor belt onto an appropriate conveyor belt based on the letter label to ensure that the packages reach the appropriate aisle.

33.    When the package reaches the appropriate lettered aisle, there are pickers whose job it is to take the individual packages from the conveyor belt and put them on the so-called baker's racks. Finally, the packages are taken from the baker's racks by stowers who must scan and put the individual packages in large delivery tarpaulin bags located on the racks in the aisles depending on the final destination and scan the bag to ensure that the Respondent's system knows which individual package is in which tarpaulin bag. The individual packages which are oversize are carried or dragged to the sides of the racks.

34.     In addition, the sections are patrolled by line leaders whose job it is to oversee the various sections, call out lunch breaks and weed out any mistakes in the distribution of the packages. Of course, their role is also to be the eyes and ears of the manager.

35.     Finally, after the onset of the COVID virus, a new position was created – that of a PPE associates, whose job it was to distribute masks and disinfectants and ensure social distancing.

36.     The jobs at Defendant's warehouse differ substantially in terms of physical effort. The easiest jobs are those of the line leaders, Averies, and PPE associates. Loaders who take pallets of the trailers while handling heavy pallets, use mechanized carts to do so and have plenty of time for rest. Other jobs require considerably more steady physical effort.

37.     The most grueling jobs are those of stowers who must lift and drag packages and boxes from the baker's racks, run down the aisles, and put the packages into the huge delivery tarpaulin bags situated in twelve spaces on each rack. When the delivery tarpaulin bags are filled up, the stowers must haul or drag these bags to the end of each aisle, where they will be loaded onto the delivery vans and delivered to customers.

38.     The stowers' jobs are made even more difficult in the areas of the warehouse where there is no heat or air conditioning – as those areas are extremely cold in winter and extremely hot and mosquito infested in summertime.

39.      There are three shifts of workers working at the Warehouse. As relevant here, the night shift started at 8:15PM and finished at 4:45AM. Plaintiffs worked at the Warehouse on the night shift.

***Dehumanizing Work at Delivery Station DNJ-3***

40.  Just like it attempts to squeeze every dollar from the consumer, Amazon, through
     Defendant, attempts to squeeze every dollar from its workforce. Defendant pays its
     Associates a minimum wage or as close to it as possible, whilst constantly increasing
     worker productivity by engaging in constant surveillance reminiscent of the Soviet Union
     and the Deutsche Demokatische Republik and creating impossible to fulfill job quotas.
     This is why all employees in the warehouse have to work very fast.

41.  Defendant closely monitors the performance of its workforce and collects data about the
     speed with which each person works. Security cameras monitor workers; workers use
     scanners which allow Defendant to track where each worker is in the facility or how fast
     he or she works. For each package that they put into bins, stowers have a counter on the
     screen – which tells them how fast they are supposed to put away the package before the
     counter hits zero.

42.  Workers are not allowed to talk to their co-workers; nor can they – given the production
     quota. Workers who are caught resting or talking are disciplined. Even to go to the
     bathroom they need their manager's permission.

43.  In addition to constant surveillance, Defendant's managers come up with "competitions"
     among workers to gauge the highest speed at which workers can work, so as to establish
     an ever higher productivity rates.

44.  To ensure that warehouse employees work very fast, Defendant implemented a 13 point
     discipline scale. Once an employee reaches 13 disciplinary points, he or she will be
     terminated.

45.  Upon information and belief, the disciplinary points can be given to an employee in a

totally arbitrary fashion not only for real disciplinary infractions but for such things as:

working too slow; going to the bathroom too often; being late either at the beginning of

the shift or upon returning from lunch; taking too many days off; challenging the

managers' decisions or for real or imagined transgressions or incompetence.

***Defendant's Control of Workers Turns a Bona Fide Meal Break under the FLSA and
NYLL Into a Compensable Rest Period***

46.     Under US Department of Labor regulations, there are two categories of workplace breaks:

rest breaks of short duration (5 to 20 minutes) and bona fide meal periods which are not

worktime. A shorter rest break is deemed to predominantly benefit the employer by re-

energizing the employee (29 C.F.R. § 785.18). These breaks promote the efficiency of the

employee, are customarily paid for as working time and must be counted as hours worked

(29 C.F.R. § 785.18).

47.     The meal periods are usually 30 minutes or more in duration and are not compensable

where the employee can use the entire period of the meal break for his or her own

purposes. (29 C.F.R. § 785.19).

48.     The NYLL adopts the federal rules regarding rest and meal breaks.

49.     In order to maximize on its workers' productivity, Defendant controls the place, time  and

the manner in which workers, Plaintiffs included, take their meal breaks. Yet this control

creates a situation where workers' meal break of thirty (30) minutes becomes in reality a

five to ten minute period to consume victuals, thus turning a bona fide meal break into a

compensable rest break.

50.     At all relevant times, Defendant gave its workers a thirty (30) minute break for a meal – a

break for which Defendant did not pay workers any wages.

51.    Being late from lunch even a few minutes can subject a worker to the infamous demerit points from the 13 point pool.

52.    The remoteness of the Warehouse makes it very difficult for Defendant's workers, especially for those who work night shifts, to buy meals from outside, as the Warehouse is located in an isolated area with no places offering food in its proximity such that anyone could walk out of the facility, purchase food, eat it and return to the Warehouse in time. Consequently, upon information and belief, nobody does it, as such a venture would last much longer than 30 minutes and would indubitably subject one to demerit points.

53.    Nor could workers, Plaintiffs included, order food to be delivered to the Warehouse using their smarphones. According to Defendant's rules, every worker must leave his or her smartphone in the locker room upon entering the Wareheouse floor at the beginning of the shift.

54.    Only Mancebo and his deputies could have smartphones on the floor of the Warehouse and thus could order food from the outside.

55.    According to Defendant's rules, workers are prohibited from eating at their work station or anywhere else, except for the break room. Nor can they bring any food to the Warehouse. If they bring their own lunch to work, they must leave it in the locker or in the refrigerator in the break room which also functions as a locker room and is located at one end of the Warehouse.

56.    The only choice workers at the Warehouse have is to take their meal break in the break room. Yet the break room is inadequate to accommodate all workers having lunch at the

same time. At the time that Plaintiffs worked for Defendant there were not enough chairs and tables, there was 1 soda machine, 2 vending machines, 2 microwaves and one refrigerator. Upon information and belief, such conditions at the Warehouse have persisted until the present.

57.    At the Warehouse, the night shift on which Plaintiffs worked consists of 80 to 100 workers. However, during the busy season from November through February, the night shift swells to as many as 300 workers. Upon information and belief, similar numbers of workers work the morning and the afternoon shifts.

58.    Yet, despite such multitude of workers, Defendant does not stagger a meal break – when the lunch is called out, all workers must stop their activities and follow a yellow tape to the break room.

59.    Given the huge number of workers all going in the same direction, a huge throng of people forms and slowly moves to the break room. A vast majority of them have to walk in such conditions the entire length of the Warehouse. Before, however, they can even reach the break room, workers must wait to cross the road within the Warehouse on which delivery vans dart back and forth. Yet even crossing the road is not the end of their trek.

60.    Prior to entering the break room, each of the throng of workers must clock out from the Warehouse by tapping his or her work ID to a device. To do so, they have to wait on line until those before them clock out. Only after they are clocked out, can they enter the break room.

61.    Plaintiffs and others similarly situated, made such a trek every day they worked. Plaintiffs

estimate that to reach the clock-out device they and others similarly situated needed on average seven (7) minutes. Plaintiffs estimate that waiting in line to clock out of the warehouse took on average four (4) minutes. Upon information and belief, workers need such times to reach the break room until the present.

62.    Yet even entering the break room does not finish workers', including Plaintiffs', misery. Given the scarcity of the vending machines, lines immediately formed to purchase food or soda. Those who brought lunch with them and left it in the refrigerator, have to form a line to get their food from the refrigerator. Others have to dash to their lockers to retrieve their food.

63.    When one finally got his or her food, another chapter of the misery unfolds – the musical chairs game. There are not enough chairs or benches and tables in the break room to accommodate those ready to consume their food. So, those who lucky ones who have seats, wolf down their food to make space for the others who are milling around, waiting for a seat.

64.    There is another reason to wolf down one's food beyond the nasty looks of those waiting – one has to make the same trek back to the work station to be there within thirty (30) minutes, so as to avoid demerit points.

65.    Those who finish their meal, have to wait in line had to wait on line to clock back into the Warehouse. Then, they have to cross the road and walk back to their work stations in a throng of people, which slows down the trip.

66.    Plaintiffs estimate that the return trip to the work station from the moment one finished one's meal takes a similar amount of time as the trek to the break room. Thus, it takes

several minutes (3 to 4) to wait in line to clock back into the Warehouse and approximately five (5) to seven (7) minutes to make it to one's work station in a timely manner. Upon information and belief, such conditions persist at the Warehouse until today.

67.    In all, Plaintiffs estimate that their actual break, and the break of other workers, lasted from five (5) to ten (10) minutes only. The rest of the time, Plaintiffs and others similarly situated have had to comply with Defendant's rules.

68.    Plaintiffs and others on the night shift suffered through this routine on a daily basis during their employment at Defendant's warehouse. Upon information and belief, workers working the morning and the afternoon shifts, faced the same situation with respect to their lunch break on a daily basis.

69.    Defendants' rules concerning the manner and place in which its workers at the Warehouse had to take a lunch break, have converted an FLSA-mandated *bona fide* meal break into a "rest break" which is compensable under the FLSA and NYLL.

70.    At all relevant times, Defendant paid each worker a minimum wage or close to it. Each Plaintiff was paid $15.25 per hour – 25 cents above the minimum wage for New York City – plus a 50 cent shift differential for working on the night shift. Upon information and belief, Defendant's other workers received the same wage per hour, except that those working on the morning and afternoon shift did not receive the shift differential.

71.    Given the fact that, in reality, Plaintiffs' meal break was nothing more than a compensable rest break, Defendant owes each Plaintiff one half-hour's pay or $7.88 per day. This shortfall makes the pay that Plaintiffs received throughout their period of

emloyment fall short of the $15 per hour minimum wage mandated for large businesses in New York City.

72.    Upon information and belief, each of Defendant's workers working the morning or the afternoon shift is owed $7.63 per day, and each of those working on the night shift is owed $7.88 per day. As all of these workers were paid a minimum wage, a daily deficit of even such a small sum made <u>all</u> of their wages fall below the minimum wage.

73.    Given the length of time each of them worked four day weeks, Plaintiffs Leitch and Samuels estimate that each is owed at least $980 in unpaid minimum wages, and Plaintiff Ruiz estimates that she is owed at least $1,180 in unpaid minimum wages, plus like amounts in liquidated damages, under the FLSA and the NYLL.

### *Defendant's Wage Violations Were Willful*

74.    Defendant as an employer has certain statutory obligations towards its employees, including paying employees for all of the hours they worked, paying the overtime premium of one-and-a-half times their regular rate for each hour worked in excess of 40 per week, and making, keeping, and preserving proper payroll records.

75.    Defendant through its executives and managers was aware of its requirement to provide Plaintiffs and others similarly situated a bona fide meal break which they could use for their purposes, to pay them for all hours they worked and to pay them the overtime premium of one-and-a-half times their regular rate for each hour worked in excess of forty (40) per week.

76.    Moreover, Defendant further willfully disregarded and purposefully evaded the requirements of Section 162 of the NYLL mandating a 45-minute meal break for workers

whose shift began from 1:00PM to 6:00PM, and offered Plaintiffs and others similarly situated only a 30-minute break, which was further reduced by the travel time to and from the break room and other requirements to a 5 to 10 minute break.

77.    As such, the various violations of the law which are alleged herein were committed intentionally or willfully by Defendant.

## FACTS RELATING TO DISCRIMINATION

### *Walkis Mancebo and His Discriminatory Ways*

78.    Yet facing daily treks back and forth, lemming style, to the break room for a five to ten minute lunch was not the only indignity that Plaintiffs, and others who worked on the night shift faced.

79.    To manage the night shift, at all relevant times, Defendant employed Walkis Mancebo as the night shift manager. Mancebo has three assistant managers but given his military background, Mancebo is the person with ultimate authority.

80.    While Mancebo is not responsible for hiring of the employees, he is the one who has the ultimate authority in all other respect of their employment, such as to assign workers to a particular position in the Warehouse, to discipline them and to override the time keeping system to change the hours.

81.    Upon information and belief, Mancebo is a former military man. And at all relevant times, he ran the Warehouse as a military operation. But unlike the military, Mancebo indulged his prejudices and engaged in a discriminatory conduct directed at certain groups of workers, including Leitch, who were undesirable in Mancebo's view.

82.    Mancebo is a cripple who walks with a limp. Yet, upon information and belief, Mancebo

indulges his machismo to the hilt: he does not like homosexual men, black people and unattractive women. Yet he likes his own kind, and has favored Hispanics in awarding them with more desirable positions.

83. While various positions require a different level of physical effort and certain physical predispositions, Mancebo allocates employees to different positions based on his predilections and prejudices.

84. Loaders use mechanized equipment to unload pallets from the trailers. They have a lot of time to rest in between servicing trailers. During the down time, they can ogle Averies, who busy themselves with labeling individual boxes nearby. These are much coveted positions of loaders are populated by macho Hispanic men: Chris Rodriguez, William l/n/u, Jason l/n/u, Victor Martin.

85. The relatively easy positions of Averies are given out to young, attractive women, especially those women who, upon information and belief, fulfill Mancebo's standards of female beauty – slender with ample bottoms and bosoms. Here, Mancebo did not discriminate based on race or national origin, but only based on female looks. Thus, two black women who met Mancebo's exacting standards worked exclusively as Averies. But the one who tugged at the deeper fibers of Mancebo's and, presumably, the other loaders' soul was a certain Hispanic woman.

86. After working as an Avery, that Hispanic woman then became a line leader, a position awarded by Mancebo only to females he finds attractive and yes-men.

87. Alas, Ruiz, a Hispanic female, was not so lucky. She was not young and does not have the requisite slender body with ample appendages. Nor does it help that Ruiz has a

medical disability. She began her work at the Defendant as an Avery but she did not meet

with Mancebo and the Hispanic loaders' exacting standards of female beauty. So,  Ruiz

was quickly relegated from the easy position of an Avery to the position of a diverter,

then a picker and then, a stower, positions with increasingly higher physical exertion, all

designed to make sure that Ruiz would accumulate the requisite 13 disciplinary points so

as to be terminated.

88.    Samuels also fell victim to Mancebo's use of the 13 point system to get rid of

undesirables. Samuels is a short, black man. He has a rather languid comportment and

manner of speech, which many consider eccentric. But Mancebo took Samuels'

comportment as a developmental disability and put him in positions of increasingly

higher physical exertions all designed to make sure that Samuels accumulated 13

disciplinary points. Despite his requests that he be reassigned to a different position, Mr.

Samuels was designated as a stower and ultimately terminated when he accumulated 19

disciplinary points.

89.    The loading dock and the Avery area are also coveted positions to work at Defendant's

Warehouse for other reasons. There is a PA system through which music is piped in and,

above all, there is a working HVAC system which keeps the area warm in winter and cold

in summer time.

90.    Unlike Hispanics and young attractive women, black people do not fare too well under

Mancebo's reign. Two positions requiring the most physical exertion: unloaders and

stowers are populated by black people. A majority of unloaders are black and over 80%

of stowers, including Leitch and Samuels, are black. This statistical anomaly can only be

attributed to Mancebo's prejudice against black people and the discriminatory manner in which he assigned most grueling positions to .

91.    The loaders, while working in a comparably quality environment, listen throughout the shift to the tunes of merengue, bachata and other Hispanic tunes. Upon information and belief, music that black people would be more likely to listen to does not make it to the playlist at the Defendant's warehouse.

### Facts Relating to Discrimination of Plaintiff Leitch

92.    Leitch attended a job fair at a midtown Manhattan hotel wherein he applied for a job as an associate at Respondent.

93.    Having been hired, Leitch presented to the Warehouse and was immediately assigned to the position of stower by Mancebo.

94.    Leitch soon observed that a vast majority of stowers and unloaders were black, and all gay men were put to work as stowers.

95.    Leitch felt from the beginning that Mancebo spoke to him in a rude and condescending manner for no reason at all. Upon information and belief, Mancebo immediately realized from Leitch's speech and mannerisms that Leitch is homosexual – a no, no in Mancebo's human lexicon.

96.    Not only was Leitch given the hardest position, but was also dispatched by Mancebo and his subordinates to an area of the Warehouse where there was no functioning HVAC system, which made Leitch's job all the more grueling.

97.    Leitch complained to Mancebo about these issues on numerous occasions throughout his employement but to no avail.

98.    Soon after he started his job, Leitch learned from other employees that Mancebo had told

them that did not like Leitch because he was gay. Leitch learned that Mancebo referred to

him in Spanish as "faggot" and "homo" and used other pejorative terms to describe

Leitch's sexuality. On occasions too numerous to list, Leitch observed Mancebo approach

him while mumbling in Spanish under his breath, which Leitch believed were cursewords

directed at him.

99.    Throughout the period of Leitch's employment, Mancebo conducted himself towards

Leitch in a consistently rude and condescending manner. In contrast, Leitch observed that

Mancebo always treated his Hispanic employees, especially the Hispanic loaders and

attractive Averies, in a kind and friendly manner.

100.    When the COVID pandemic hit, Leitch and other stowers were not given masks for two

months. Leitch complained about it to Mancebo and other assistant managers. Alas,

nothing was done.

101.    Leitch was an exemplary employee. At Defendant, stowers have certain minimum

number of packages to stow on a daily basis. Leitch not only met the minimum criteria

but was consistently the best stower on the shift. Yet this did not impress Mancebo.

102.    During the busiest period before Thanksgiving and through the New Year of 2020,

Mancebo decided to implement a reward system for the stowers on the night shift. The

stower who got the highest number of packages stowed was to receive a reward – usually

a gadget or a gift card. Leitch was consistently the highest producing stower and won

beats headpohones and at least five Amazon gift cards. When Mancebo realized that

Leitch kept winning the contest, he stopped giving rewards that Leitch had won but

continued the contest.

103.    In addition, Mancebo always found fault with Leitch's work and kept giving Leitch

undeserved disciplinary points for trivial or imagined transgressions – transgressions for

which non-black or straight employees were not disciplined. Leitch opposed such an

unfair disciplinary measures each time Mancebo meted them out. Mancebo let Leitch

know that he brooked no opposition.

104.    Leitch initially complained to HR regarding the unfair discipline by Mancebo but no

action was taken. Subsequently, in discussions with other employees, Leitch realized that

continuing to complain to HR about Mancebo was futile. Leitch understood that, if he

continued to complain to HR, he would be fired.

105.    Yet despite his exemplary work, Leitch could not avoid receiving 13 disciplinary points

from Mancebo for trivial or imagined transgressions and was terminated. Leitch avers

that this was pretextual and that the true reason was Mancebo's discriminatory animus

towards him.

### *Facts Relating to Discrimination of Plaintiff Samuels*

106.    Samuels attended a job fair at a midtown Manhattan hotel wherein he applied for a job as

an associate at Defendant.

107.    Samuels has a rather languid comportment and manner of speech. He is also short and

portly. When he was hired, Samuels presented to Respondent's Warehouse. When

Mancebo took stock of Samuels, he could not help but notice Samuels' race but also,

upon information and belief, based on Samuels' comportment Mancebo concluded that

Samuels has a developmental disability and decided to get rid of Samuels.

108. Samuels worked briefly in several positions but Mancebo decided that the quickest way to get rid of Samuels was to put him in the position of a stower – a job at which Samuels struggled, given his constitution.

109. Not only was Samuels given the hardest position, but also ultimately he was assigned by Mancebo to an area of the Warehouse where there was no functioning HVAC system. This made Samuels' job even more difficult than normally. Samuels observed that while he and other black stowers toiled in difficult conditions in the area of the Warehouse where there was no HVAC system or music, others – mostly Hispanic employees and attractive Averies – did have such amenities.

110. On numerous occasions, Samuels requested of Mancebo and assistant managers that he should be reassigned from the position of a stower to at least that of a picker or a diverter. Alas, to no avail.

111. During the course of his employment with Respondent, Samuels realized that a vast majority of stowers and unloaders – two most exhausting positions – were black.

112. Samuels also observed the marked difference in treatment by Mancebo and assistant managers of black employees and those of the Hispanic heritage or attractive women.

113. Throughout the period of Samuels' employment, Mancebo conducted himself towards him in a consistently rude and condescending manner. In contrast, Samuels observed that Mancebo always treated his Hispanic employees, especially the Hispanic loaders, and attractive Averies in a kind and friendly manner.

114. Mancebo always found fault with Samuels' work. Mancebo complained that Samuels was stowing too slow, but at the same time refused to reassign Samuels to a different, less

strenuous position. Moreover, Mancebo complained to Samuels that he took too many bathroom breaks or that Samuels engaged in excessive absenteeism and kept giving Samuels undeserved disciplinary points for these imagined transgressions.

115.    Upon information and belief, Mancebo doctored Samuels' time sheets to make days on which Samuels worked as absences or to appear that Samuels was habitually late. Mancebo's conduct was possible because, owing to an error at the HR, Samuels' app – Amazon A to Z – did not work, and could not be fixed. Consequently, Samuels was forced to ask Mancebo or his deputies to key in his hours on a daily basis.

116.    Samuels did not complain about Mancebo to the Human Resources because he had learned from other employees at Respondent's warehouse that Mancebo, as a former military man, had such a cachet with the HR that Samuels' complaints would not be taken seriously and that Samuels would be terminated by Mancebo for complaining.

117.    Yet Samuels was terminated by Mancebo because he allegedly accumulated 19 disciplinary points. Samuels avers that the disciplinary points were improperly given him and that his dismissal for having more than 13 points was pretextual and was the result of Mancebo's discriminatory animus towards him.

***Facts Relating to Discrimination of Plaintiff Ruiz***

118.    Ruiz attended a job fair at a midtown Manhattan hotel wherein he applied for a job as an associate at Respondent.

119.    Having been hired, Ruiz presented to the Warehouse and, given her disability, was hoping to work as an Avery and, eventually, a line leader. She expressed her hopes to Mancebo.

120. Alas, Ruiz was not lucky. She is not young enough and does not have the requisite slender body with ample appendages. Nor does it help that Ruiz has a medical disability.

121. Because Ruiz did not meet with Mancebo and the Hispanic loaders' exacting standards of female beauty, Mancebo quickly relegated Ruiz to the position of a picker.

122. In or about February 2020, Mancebo switched Ruiz to the position of a diverter and put her in the section of the Warehouse in which there was no air conditioning.

123. Ruiz struggled with the position of a diverter not only because of her short height but also because of her disability. As a diabetic she needed to make sure her sugar levels did not drop too low. But at the Warehouse, workers are not allowed to eat their food at the station at which they work, but only at the Cafeteria. Ruiz's diabetes required that, in addition to the medications, she had to consume food to regulate the level of sugar in her body.

124. Ruiz performed her duties the best she could but the onset of the Spring caused the temperatures in her area of the Warehouse to rise substantially on a daily basis. Heat bothered Ruiz very much, which in addition to her physical exertion greater than otherwise because of her corpulence and height, made her work as a diverter in a hot area of the Warehouse unbearable.

125. In or about the beginning of April 2020, Ruiz explained to Mancebo her problems with being a diverter and expressed a desire to perform a less gruelling work, such as an Avery or a line leader. Mancebo spoke to her in a condescending manner about the possibility of getting such a position, and then ignored her requests, which she repeated several times.

126. After a short time, Ruiz managed to speak to Mancebo's superior about the problems she

was having with Mancebo's inaction. However, her complaints to Mancebo's superior did not improve Ruiz's lot. The opposite happened.

127.    Soon thereafter, Mancebo switched Ruiz to the position of a stower in the hot section of the Warehouse. The position of a stower required even greater physical exertion from Ruiz than the position of a diverter.

128.    Ruiz understood that Mancebo switched her to the position of a diverter so that she would fail and rack up 13 negative points and thus be terminated from employment.

129.    Knowing that Mancebo would do nothing for her, Ruiz complained about her predicament to Mancebo's deputies. One of them, Quentin, finally relented and in or about the end of May or early June switched Ruiz to the position of an Avery.

130.    Ruiz was grateful for the change. However, Mancebo's chosen Averies were very unhappy with Ruiz being an Avery and complained to Mancebo. Ruiz soon learned that Mancebo was not happy with her being an Avery and was looking to switch her back to the much less desirable positions.

131.    In or about July 2020, Ruiz went on an FMLA leave but, having in perspective the return to a position that she was unable to perform due to her disability, Ruiz decided to abandon her job in or about September, 2020. Ruiz was constructively terminated from her position at the Defendant.

## COLLECTIVE ACTION ALLEGATIONS

132.    Plaintiffs bring this action on behalf of themselves and all other persons who were or are employed by the Defendant as Associates but did not receive the compensation required by the FLSA and the federal wage orders codified in 29 C.F.R. § 552 *et. seq.* in

respect to their work for Defendant within the three years preceding the filing of this action.

133.    Upon information and belief, this class of persons consists of at least five hundred (500) persons.

134.    There are questions of law and fact common to the class, specifically:

a. whether the employment of Plaintiffs and other workers by the Defendant is subject to the jurisdiction and the wage and overtime requirements of the FLSA and the federal wage orders codified in 29 C.F.R. § 552 et. seq.;

b. whether the restrictions on workers' time, manner and place of taking their 30 minute meal break reduced it in actuality to a compensable rest break;

c. the time necessary to travel from one's work station to the clock out device and vice versa;

d. the wait time necessary to clock out of the Warehouse floor and to clock back in after consuming a meal.

Only the amount of individual damages sustained by each class member will vary.

135.    Plaintiffs and Defendant's other employees are similarly situated insofar as Defendant instituted at the Warehouse a policy of restricting the time, manner and place of consuming a meal that severely reduced workers' time within which to consume the meal, such that their all their regular hours worked fell below the minimum wage.

136.    Plaintiffs bring the first claim for relief herein on behalf of themselves and all persons similarly situated as a collective action pursuant to the FLSA, in respect to all claims that Plaintiffs and all persons similarly situated have against the Defendant as a result of

Defendant's violations of the FLSA and the federal wage orders codified in 29 C.F.R. § 552 et. seq.

## CLASS ACTION ALLEGATIONS UNDER RULE 23
## FOR VIOLATIONS OF THE NYLL

137. Plaintiffs bring this action on behalf of themselves and all other persons who were or have been employed by the Defendant within the past six years immediately preceding this action as Associate and who did not receive the compensation required by the NYLL and the wage codified in 12 N.Y.C.R.R. §§ 137-143.

138. This class of persons consists of several hundred persons, and the class is thus so numerous that joinder of all members is impracticable under the standards of Fed. R. Civ. P. 23 (a)(1).

139. There are questions of law and fact common to the class which predominate over any questions affecting only individual members, specifically: whether the employment of the Plaintiff and others similarly situated by Defendants is subject to the jurisdiction and the wage and overtime requirements of the NYLL and whether Plaintiffs and others similarly situated suffered from Defendant's policy or plan to severely restrict workers' time, manner and place of taking their 30 minute meal break reduced it in actuality to a compensable rest break; the time necessary to travel from one's work station to the clock out device; and the wait time necessary to clock out of the Warehouse floor and to clock back in after consuming a meal. Only the amount of individual damages sustained by each class member will vary.

140. The claims of the Plaintiffs are typical of the claims of the above-described class in that

all of the members of the class have been similarly affected by the acts and practices of

the Defendant.

141.    Plaintiffs will fairly and adequately protect the interests of the members of the class, in

that their interests are not adverse to the interests of the other members of the class.

142.    In addition, Defendant has acted or refused to act on grounds that apply generally to the

class, so that declaratory relief is appropriate respecting the class as a whole under Fed. R.

Civ. P. 23 (b)(2).

143.    A class action is superior to other available methods for the fair and efficient adjudication

of the controversy under the standards of Fed. R. Civ. P. 23 (b)(3).

144.    Plaintiffs bring the second claim for relief herein on behalf of themselves individually and

on behalf of all persons similarly situated as a class action pursuant to Rule 23, in respect

to all claims that Plaintiffs and all persons similarly situated have against the  Defendant

for violations of the NYLL and the wage orders codified in 12 N.Y.C.R.R. §§ 137-143.

**CLASS ACTION ALLEGATIONS UNDER RULE 23 FOR VIOLATIONS OF
TITLE VII, SECTION 1981, THE NYSHRL AND NYCHRL**

145.    Plaintiffs bring this action on behalf of themselves and the putative class of  black,

female-, non-heterosexual- and disabled employees working on the night shift at

Defendant's Warehouse who were or have been subjected to discrimination,  harassment

in the form of a hostile work environment and retaliation for the exercise of their rights,

at the hands of Defendant's night manager, Walkis Mancebo or his deputies.

146.     Upon information and belief, this class of persons consists of not less than fifty (50)

persons, and the class is thus so numerous that joinder of all members is impracticable

under the standards of Fed. R. Civ. P. 23 (a)(1).

147.   There are questions of law and fact common to the class which predominate over any

questions affecting only individual members, specifically: whether the assignment of the

members to positions other than loaders, Averies, line leaders and PPE workers was the

result of Walkis Mancebo's discriminatory intent; whether the employment of Plaintiffs

and other members of the class by the  Defendant is subject to the jurisdiction and the

requirements of Title VII, Section 1981, the NYSHRL and the NYCHRL, and whether a

declaratory judgment against Defendant from violating the above laws is appropriate.

Only the amount of individual damages sustained by each class member will vary.

148.   The claims of the Plaintiffs are typical of the claims of the above-described class in that

all of the members of the class have been similarly affected by the acts and practices of

the Defendant's night manager and his deputies.

149.   Plaintiffs will fairly and adequately protect the interests of the members of the class, in

that their interests are not adverse to the interests of the other members of the class.

150.   In addition, Defendant has acted or refused to act through its night manager, Walkis

Mancebo and his deputies, on grounds that apply generally to the class, so that a

declaratory relief is appropriate respecting the class as a whole under Fed. R. Civ. P. 23

(b)(2).

151.   A class action is superior to other available methods for the fair and efficient adjudication

of the controversy under the standards of Fed. R. Civ. P. 23 (b)(3).

152.   Plaintiffs bring the third through the sixth claim for relief relief  on behalf of themselves

individually and all persons similarly situated as a class action pursuant to Federal Rule

of Civil Procedure 23, in respect to all claims that they have as a result of Defendant's

violations of Title VII, Section 1981, the NYHRL and the NYCHRL.

## FIRST CLAIM FOR RELIEF
### FLSA violations

153.    Plaintiffs and others similarly situated repeat and reallege each and every allegation

previously set forth.

154.    Plaintiffs and others similarly situated bring this claim for relief pursuant to the

applicable provisions of the FLSA, 29 U.S.C. § 206 and § 207, and the Wage Orders

issued under the FLSA at 29 C.F.R. § 552 et. seq., under which Plaintiffs and others

similarly situated were entitled to a minimum wage and an overtime hourly wage of time

and one-half their regular hourly wage for all hours worked in excess of forty hours per

week.

155.    Plaintiffs and others similarly situated were not paid for a meal break which, through

Defendant's restrictions on time, manner and place of taking it, was reduced to a

compensable rest break. Defendant's failure to pay for such a break brought Plaintiffs'

and others' similarly situated hourly rate below the minimum wage.

156.    Plaintiffs and others similarly situated seek a judgment for unpaid minimum wages,

overtime wages, such sums to be determined based upon an accounting of the hours

worked by, and wages actually paid to, Plaintiffs; and Plaintiffs also seek an award of

liquidated damages, attorneys' fees and costs as provided for by the FLSA.


[no more text on this page]

## SECOND CLAIM FOR RELIEF
### NYLL violations

157. Plaintiffs and others similarly situated repeat and reallege each and every allegation previously set forth.

158. Pursuant to the New York Labor Law Articles 6 and 19, as well as the Wage Orders issued under the New York Labor Law at 12 N.Y.C.R.R. §§ 137-143. Plaintiffs and others similarly situated were entitled to certain hourly minimum wages, overtime wages, promised wages and other wages, all of which the Defendants intentionally and willfully failed to pay in violation of such laws.

159. Plaintiffs and others similarly situated were not paid for a meal break which, through Defendant's restrictions on time, manner and place of taking it, was reduced to a compensable rest break. Defendant's failure to pay for such a break brought Plaintiffs' and others' similarly situated hourly rate below the minimum wage.

160. Plaintiffs and others similarly situated seek a judgment against all Defendants for all wages which should have been paid, but were not paid, pursuant to the NYLL and the Wage Orders issued thereunder; the total amount of such unpaid wages to be determined at trial upon an accounting of the hours worked by, and wages paid to, each Plaintiff , along with an award of attorneys' fees, interest and costs as provided under NYLL §198 and §663.

## THIRD CLAIM FOR RELIEF
### Discrimination, Hostile Work Environment and Retaliation Under Title VII

161. Plaintiffs repeat and reallege each and every allegation previously set forth.

162. When employed by Defendants, Plaintiffs and others similarly situated were employees

within the meaning of Section 2000e(f) of Title VII.

163.    Defendant was an employer within the meaning of Section 2000(e)(b) of Title VII.

164.    Section 2000e-2(a) of Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's ... race, color, sex, or national origin".

165.    Title VII also makes it unlawful for an employer to take adverse action against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge. . . . in an investigation, proceeding, or hearing under this subchapter."Defendant through its officers, managers and employees, engaged in discrimination on the basis of race, color, sex or national origin, sex sufficient to alter the terms and conditions of Plaintiffs' employment.

166.    Defendant through its officers, managers and employees discriminated against Plaintiffs and others similarly situated by treating them differently and less favorably than its Hispanic, attractive female and heterosexual employees based on Plaintiffs Leitch and Samuels' black race and skin color and their African American national origin; Plaintiff Leitch's sexual orientation and Plaintiff Ruiz's alleged non–attractiveness, by subjecting Plaintiffs and others similarly situated, among other things, to disparate working conditions, discriminatory disciplinary procedures, and discriminatory termination of Plaintiff Leitch, Ruiz and others similarly situated's employment solely because of their protected characteristics, all in violation  of Section 2000e-2(a) of Title VII.

167.    Defendant also unlawfully discriminated against Plaintiffs and others similarly situated by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy

a hostile work environment.

168.  By virtue of the acts complained of herein, the hostile work environment on the night shift at the Warehouse was sufficiently severe and pervasive to alter the terms and conditions of Plaintiffs' employment and create a subjectively and objectively abusive/discriminatory work environment.

169.  Also, Defendant retaliated against Plaintiffs and others similarly situated by, inter alia, (i) subjecting Plaintiffs to materially adverse actions that would deter a reasonable employee from engaging in protected activity for his or her opposition to, and complain against, Defendant's discriminatory practices, and (ii) terminating Plaintiffs Leitch and Ruiz's employment shortly after they made their protected complaints to Defendants. Such retaliation was inflicted subsequent to, and in direct connection with, Plaintiffs' complaints of race, color, sex, and/or national origin discrimination.

170.  Defendant is liable for the discrimination, hostile work environment and retaliation against Plaintiffs and others similarly situated because they were created and fostered by its officers, managers, and employees and/or because the Defendant did not take adequate steps to prevent or address instances of discrimination.

171.  Said discrimination , hostile work environment and retaliation occurred with malice and reckless disregard of Plaintiffs' rights.

172.  As a result of Defendant's discrimination and hostile work environment, Plaintiffs suffered and continue to suffer damages, including but not limited to lost income, mental anguish, and pain and suffering and interest thereon.

173.  Plaintiffs are also entitled to an award of punitive damages, attorney's fees, and costs

because  Defendant's unlawful and discriminatory actions constitute malicious, willful

and wanton violations of Title VII.

### FOURTH CLAIM FOR RELIEF
### Discrimination, Hostile Work Environment and Retaliation Under 42 U.S.C. §1981

174.    Plaintiffs repeat and reallege each and every allegation previously set forth.

175.    Section 1981 of Title 42 of the United States Code (the Civil Rights Act of 1866), as

amended, provides, in pertinent part, that "[a]ll persons within the jurisdiction of the

United States shall have the same right . . . to make and enforce contracts … as is enjoyed

by white citizens …" This section thus outlaws discrimination with respect to the

enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, and

has been interpreted to prohibit race discrimination in hiring and employment.

176.    Section 1981 also prohibits retaliation against employees for opposing, or complaining

about, discrimination.

177.    Defendant discriminated against Plaintiffs Leitch and Samuels and others similarly

situated by treating them differently and less favorably than its Hispanic employees based

on their black race, skin color and their African-American national origin by subjecting

them, among other things, to disparate working conditions, discriminatory disciplinary

procedures, and discriminatory termination of Leitch and others' employment solely

because of their protected characteristics, all in violation of Section 1981.

178.    This discrimination was a result of intentional actions by Defendant, deliberate

indifference by Defendant, and/or the result of Defendant's maintaining a practice that

has a disparate impact on its black employees, including Plaintiffs Leitch and Samuels,

namely a practice that denied their black employees opportunities for better, less gruelling positions or advancement at the Warehouse.

179.    Defendant also unlawfully discriminated against Plaintiffs Leitch and Samuels and others similarly situated on the basis of their race, color, and/or national origin by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment created by its night manager, Mancebo and his deputies.

180.    By virtue of the acts complained of herein, the hostile work environment on the night shift at the Warehouse was sufficiently severe and pervasive to alter the terms and conditions of Plaintiffs' employment and created a subjectively and objectively abusive/discriminatory work environment.

181.    Finally, Defendants retaliated against Plaintiff Leitch by, *inter alia*, (i) subjecting Plaintiff Leitch to materially adverse actions that would deter a reasonable employee from engaging in protected activity for his or her opposition to, and complain against, Defendants' discriminatory practices, and (ii) terminating Plaintiff Leitch's employment shortly after he made his protected complaints to Defendants. Such retaliation was inflicted subsequent to, and in direct connection with, Plaintiff Leitch's complaint of race and ethnicity discrimination.

182.    Defendant is liable for the discrimination of and hostile work environment directed at Plaintiffs Leitch and Samuels and others similarly situated, as well as for retaliation against Plaintiff Leitch because such conduct was created and fostered by its officers and managers, and/or because the Defendant did not take adequate steps to prevent or address instances of discrimination.

183.    As a result of Defendant's discrimination, hostile work environment and retaliation,

Plaintiffs and others similarly situated suffered and continue to suffer damages, including

but not limited to, lost income, mental anguish, and pain and suffering.

184.    Plaintiffs are also entitled to an award of punitive damages, attorney's fees, and costs

because Defendant's unlawful and discriminatory actions constitute malicious, willful

and wanton violations of Section 1981.

**FIFTH CLAIM FOR RELIEF**
**Discrimination, Hostile Work Environment and Retaliation**
**Under the NYHRL**

185.    Plaintiffs repeat and reallege each and every allegation previously set forth.

186.    New York Executive Law § 296(1) provides that, "It shall be an unlawful discriminatory

practice: (a) For an employer ..., because of an individual's ... race, creed, color, national

origin, sexual orientation, sex, disability... or to bar or to discharge from employment

such person or to discriminate against such person in compensation or in terms,

conditions or privileges of employment."

187.    New York Executive Law § 296(1)(e) prohibits discrimination against any person

expel or otherwise discriminate against any person " because he or she has opposed any

practices forbidden under this article or because he or she has filed a complaint..."

188.    Defendant discriminated against Plaintiffs and others similarly situated on the basis of

race, creed, color, national origin, sexual orientation, sex, disability by treating them

differently and less favorably than its Hispanic employees, attractive female employees,

heterosexual- and able-bodied employees by subjecting Plaintiffs and others, among other

things, to disparate working conditions, discriminatory disciplinary procedures, and

discriminatory termination of their employment in violation of Section 296(1) of New York Executive Law.

189. Defendants also unlawfully discriminated against Plaintiffs and others similarly situated by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment.

190. By virtue of the acts complained of herein, the hostile work environment on the night shift at the Warehouse was sufficiently severe and pervasive to alter the terms and conditions of Plaintiffs and others' employment and create a subjectively and objectively abusive/discriminatory work environment.

191. Said discrimination and hostile work environment occurred with malice and reckless disregard of Plaintiffs' rights.

192. Defendants retaliated against Plaintiffs by, inter alia, (i) subjecting Plaintiffs to materially adverse actions that would deter a reasonable employee from engaging in protected activity for his or her opposition to, and complaining against, Defendants' discriminatory practices, and (ii) terminating Plaintiff Leitch and Ruiz's employment shortly after they made their protected complaints to Defendants. Such retaliation was inflicted subsequent to, and in direct connection with, Plaintiff's complaint of national origin discrimination.

193. As a result of Defendants' discrimination, hostile work environment and retaliation, Plaintiffs suffered and continues to suffer damages, including but not limited to lost income, mental anguish, and pain and suffering.

194. Plaintiffs are also entitled to an award of punitive damages, attorney's fees, and costs because  Defendant's unlawful and discriminatory actions constitute malicious, willful

and wanton violations of Section 296.

**SIXTH CLAIM FOR RELIEF**
**Discrimination, Hostile Work Environment and Retaliation**
**Under the NYCHRL**

195.    Plaintiffs repeat and reallege each and every allegation previously set forth.

196.    The New York Administrative Code § 8-107.1 provides that, "It shall be an unlawful

discriminatory practice:  (a) For an employer ... because of the actual or perceived ... race,

creed, color, national origin, gender, disability, sexual orientation or to refuse to discharge

from employment such person or to discriminate against such person in compensation or

in terms, conditions, or privileges of employment."

197.    The New York Administrative Code § 8-107.7  also prohibits retaliatory conduct towards

employees: " It shall be an unlawful discriminatory practice for any person ... to retaliate

or discriminate in any manner against any person because such person has (i) opposed any

practice forbidden under this chapter, (ii) filed a complaint..."

198.    Defendant discriminated against Plaintiffs and others similarly situated on the basis of

race, creed, color, national origin, sexual orientation, sex, disability by treating them

differently and less favorably than its Hispanic employees, attractive female employees,

heterosexual- and able-bodied employees by subjecting Plaintiffs, among other things, to

disparate working conditions, discriminatory disciplinary procedures, and discriminatory

termination of their employment in violation of New York Administrative Code §

8-107.1 and  § 8-107.7.

199.    Defendants also unlawfully discriminated against Plaintiffs and others by fostering,

condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile

work environment.

200.    By virtue of the acts complained of herein, the hostile work environment on the night

shift at the Warehouse was sufficiently severe and pervasive to alter the terms and

conditions of Plaintiffs' employment and create a subjectively and objectively

abusive/discriminatory work environment.

201.    Said discrimination and hostile work environment occurred with malice and reckless

disregard of Plaintiffs' rights.

202.    Defendants retaliated against Plaintiffs by, inter alia, (i) subjecting Plaintiffs to materially

adverse actions that would deter a reasonable employee from engaging in protected

activity for his or her opposition to, and complaining against, Defendants' discriminatory

practices, and (ii) terminating Plaintiff Leitch and Ruiz's employment shortly after they

made their protected complaints to Defendants. Such retaliation was inflicted subsequent

to, and in direct connection with, Plaintiff's complaint of national origin discrimination.

203.    As a result of Defendants' discrimination, hostile work environment and retaliation,

Plaintiffs suffered and continues to suffer damages, including but not limited to lost

income, mental anguish, and pain and suffering.

204.    Plaintiffs are also entitled to an award of punitive damages, attorney's fees, and costs

because  Defendant's unlawful and discriminatory actions constitute malicious, willful

and wanton violations of Section 8-107.

## PRAYER FOR RELIEF

WHEREFORE, it is respectfully requested that the Court assume jurisdiction herein and

thereafter Plaintiffs demand a trial by jury and judgment against all Defendants as follows:

A. A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States and the State and City of New York;

B. An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiffs for all monetary and/or economic damages;

C. An award of liquidated damages under the FLSA and NYLL;

D. An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiffs for all non-monetary and/or compensatory damages, including, but not limited to, compensation for their mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical and mental injuries;

E. An award of damages to be determined at trial, plus pre-judgment interest, to compensate Plaintiffs for harm to their professional and personal reputations and loss of career fulfillment;

F. An award of punitive damages; and

G. An award of costs that Plaintiffs have incurred in this action, as well as Plaintiffs'

[no more text on this page]

reasonable attorneys' fees to the fullest extent permitted by law.

Together with such other and further relief that the Court deems just and proper.

Dated: New York, NY
        July 18, 2022

                                    Respectfully submitted,


                                    _/s/ Robert Wisniewski_
                                    Robert Wisniewski
                                    Counsel for Plaintiffs
                                    17 Stone Street, Suite 820
                                    New York, NY 10005
                                    Tel. (212) 267-2101